### At Term beginning First Monday of November, 1900.

HON. FRANCIS T. NICHOLLS, *Chief Justice.*

HON. JOSEPH A. BREAUX,
HON. LYNN B. WATKINS,
HON. NEWTON C. BLANCHARD,      } *Associate Justices.*
HON. FRANK A. MONROE,
HON. OLIVIER O. PROVOSTY,*

105    1
114   824

No. 12,615.

·B. D. WOOD & SONS VS. DONA MARIA SALA Y FABRIGAS, AND DONA MARIA SALA Y FABRIGAS VS. B. D. WOOD & SONS (CONSOLIDATED).

### SYLLABUS.

1. A name such as "Zeringue's Landing, under Nine Mile Point," sufficiently describes between the parties to an agreement of lease the object leased when other contracts for the same thing have been made between them, or the name has come to designate a particular thing in the community.

2. A lessee of property known as "Zeringue's Landing, under Nine Mile Point" having got into litigation with the purchaser of the plantation on the front of which that landing is situated, the parties compromised by continuing and extending the lease with full warranty. During the litigation and negotiations for compromise there having been no suggestion of a change in the thing leased, the lessee will not be concluded by having inadvertently signed an act of lease in which an upper boundary is given to the landing which cuts off the most valuable portion of the same which the lessor had sold to a third person. Upon being sued on his notes the lessee has the right to show eviction from such portion and to claim a reduction of rent.

---

*Hon. Olivier O. Provosty was appointed March 16, 1901, by Governor Heard, as Associate Justice, *vice* Watkins, J., deceased.

Fabrigas vs. Wood.

3. He who possesses a thing belonging to another may let it to another and warrants the enjoyment of it against the claim of the owner. (C. C. 2681, 2682). Though the lessee, if aware that the thing belonged to another or of the danger of eviction, can recover no damages, he is entitled to reduction of rent from eviction of part of the property.

ON REHEARING.

A reconsideration of this case confirms the conviction that the appellees were not aware, when they leased the "Zeringue Landing, under Nine Mile Point," from Pablo Sala, that their lessor had parted with the ownership of a large proportion of that part of the river front of the Zeringue plantation which was suitable as a safe harbor and landing, and that they were in no wise to blame for their ignorance. The appellees were, therefore, entitled to a reduction in the rent and there is no error in the proportion as heretofore fixed.

A PPEAL from the Civil District Court, Parish of Orleans— *Ellis, J.*

*Rice & Montgomery* and *William Grant* for Wood & Sons, Apellees.

*Henry Denis* for Dona Maria Sala y Fabrigas, Appellants.

The opinion of the court was delivered by

NICHOLLS, C. J. The plaintiffs allege that on October 3, 1890, they leased, under an act duly recorded, from Fortuné Zéringue, and others, the landing and river bank of the Mississippi river, known as the Zéringue landing, under Nine Mile Point, in the Parish of Jefferson, with all the rights and privileges belonging and pertaining thereto for the period of *five years,* beginning on the 15th October, 1890, at the rate of one thousand dollars per year; that in the month of October, 1891, the Citizens Bank of Louisiana, became the owner of said property under an adjudication made to it in enforcement of a mortgage it held upon the property; that the Bank ratified and affirmed said lease as against itself, collecting rents due thereunder, until the 7th of March, 1892; that said recorded lease was continued as a binding lease between them and Pablo Sala, who became the owner of the property by purchase from the Bank, on or about March 7th, 1892; that on the 9th of August, 1892, Pablo Sala, by notarial act before Grima, notary, sold and transferred to the Pacific Improvement Company, or other party, a portion of said leased premises, to-wit: the upper part thereof, having a frontage of say twenty-five hundred feet, on the Mississippi

Fabrigas vs. Wood.

river, of which sale they became aware only about the middle of November, 1894; that notwithstanding said sale and transfer, the said Sala, disregarding the same, and purposely and wrongfully concealing the fact thereof from them, brought suit to recover from them rent as stipulated in the lease aforesaid from the date of his purchase of said premises up to the 7th of August, 1892, and, thereafter, to the 7th of November, 1892, at the rate of two hundred and fifty dollars per month; that, pending said suit, a compromise was agreed upon between them and Sala, by which they were to pay him as rent for said leased premises, from the 7th of March, 1892, to the 31st of December, 1892, at the rate of one thousand dollars *per annum,* and, thereafter, upon a five years' lease, to end December 31st, 1897, at the rate of one thousand five hundred dollars *per annum,* in quarterly instalments: that, accordingly, they caused to be prepared and sent to the counsel of Sala, in said suit, a written lease to be signed in accordance with said agreement of compromise; that sometime subsequent to the compromise agreement just cited, the agent of Pablo Sala presented to them for their acceptance and signature a certain paper purporting to be a lease, representing it to be a lease of the property described in the aforesaid lease made by them with Zéringue and others, and described in the lease prepared for signature, and on the faith of said representations, and believing the same to be true, they signed said lease and remained in the possession and enjoyment of the property represented to and believed by them to be so leased and to be described in said lease up to the month of November, 1894; that at or about the time of signing said lease, and as part of the consideration of said agreement, they executed and delivered to the agent of Sala seventeen promissory notes, dated January 1st, 1894, one for two thousand three hundred and fifty-seven 64-100 dollars, with 8 per cent interest, after maturity, payable to the order of Pablo Sala, being in full of all claims for rent of said bank and landing up to the 1st of January, 1894, which note they paid; and sixteen for the sum of three hundred and seventy-five dollars, each, payable the first of April, July and January of each year, to and including the 1st of January, 1898, with interest, the same to represent the instalments of rent to become due to the term of said extended lease as agreed upon.

That the premises described in said lease between themselves and Zéringue was leased to be used and was used by plaintiffs as a coal landing and for the mooring of coal boats, for the care and custody of

which they derived large revenue; that owing to the low stage of water in the Ohio and Mississippi rivers, during the summer of 1892, preventing the arrival of coal boats and barges, they had no coal boats or barges in their custody at said leased landing from March, 1892, until the month of January, 1893, and, consequently, derived no revenue therefrom during said entire period, and they would not have compromised by stipulating to pay rent to Sala during said period, nor the increased rental at the rate of fifteen hundred dollars, save and except upon the distinct stipulation, understanding and agreement, that the lease, as aforesaid, between petitioners and Zéringue, was to be renewed, as between petitioners and Pablo Sala, and extended to December 31st, 1897; in all other respects the same as to the thing leased, terms and conditions, except as to said increased rate of rent; that they had paid all the rent notes maturing up to and including the 1st day of April, 1895, but they paid those maturing January 1st, and April 1st, 1895, under written protest served upon the executor of Pablo Sala (Sala having died).

Whereby and wherein for reasons therein assigned they reserved the right to demand, sue for and recover the amount of said notes, or so much thereof as should appear to have been exacted from them from the fault, concealment and deception practiced on them on behalf of said Sala. That the premises leased by them from Zéringue extended along the front and bank of the Mississippi river, a space say four thousand feet; that in the month of August, 1892, and during the time of petitioner's lease with Zéringue, said Pablo Sala sold to the Pacific Improvement Company, or to some third person, a part of said property, including say twenty-five hundred feet front thereof on the bank of said river; that it was only upon said purchasers demanding and dispossessing petitioners and himself taking possession of the part of the property so purchased by him in the month of November, 1894, that they became aware of the concealment and deceit practiced upon them; that during the term of their lease with Zéringue petitioners had placed improvements and conveniences in their business of mooring and caring for coal boats of which, by the concealment and practices recited, they had been deprived; that the same were of the full value of five hundred dollars, for which defendant is liable to them; that but for the belief that they were renewing for an extended term, or making a new lease for such extended term, in all respects, except as stated, the same as between themselves and the Zéringues, they would

not have signed the lease presented to them on behalf of Sala, and would not have executed any of the notes described and delivered to Sala's agent; that they were induced into said error by the act and conduct of said Sala, through his agent, in inducing them to believe that the said lease prepared and presented by him was, in all respects, the lease they had, by compromise, agreed to execute, and that the description therein was of the same property leased as aforesaid in the lease with Zéringue; that since the month of November, 1894, they have been, in the manner alleged, deprived of the possession and benefits, advantages, uses and profits of fully five-eights in quantity and measurement of the property in fact contracted and stipulated to be leased to them by Sala; that they have the right to demand and have returned to them five-eighths of the respective sums paid by them in satisfaction of said promissory notes due January 1st and July 1st, 1895, and to have the several instalments of rent evidenced by their said outstanding rent notes to become due on the 1st of July and October, 1895, and the 1st of January, April, July and October, 1896; 1st of January, April, July and October, 1897; and the 1st of January, 1898, reduced ratably as the actual property described in the lease by said Sala, signed by petitioners, bears to the property stipulated and agreed to be leased to them by Sala, that is, they shall recover of the money heretofore paid by them under protest, the aggregate sum of two hundred and eighty-one dollars and twenty-five cents, besides interest, and to have the annual rental mentioned in said lease reduced to the sum of five hundred and sixty-two dollars and fifty cents; that, since the execution of the lease, Sala had died, and Dona Maria y Fabrigas had been recognized as his sole heir and universal legatee and put in possession as such, and was answerable to petitioners in the premises; they prayed for relief conformably to the allegations.

In February, 1896, defendant answered, first, pleading the general issue. Further answering, she admitted "the execution of the lease under private signature of January —, 1894, from Pablo Sala to plaintiffs and the execution and delivery by plaintiffs of sixteen rent notes of three hundred and seventy-five dollars each, described in plaintiff's petition."

She specially denied that any concealment and deception were practiced upon plaintiffs in the preparation and execution of said act of lease, and averred, on the contrary, that plaintiffs had schemed and made the said charge only as a pretext not to pay rent under the lease; that the said act of lease, written in large, plain and very legible writ-

ing, was submitted for examination and consideration to plaintiffs and to their counsel, a prominent, very intelligent and acute lawyer, who could not possibly fail to see, read and understand the description of the leased premises, clearly and distinctly made in said act of lease; that the same remained in the possession of plaintiffs and their counsel for their consideration and acceptance during three months before they signed it, and returned it to defendant's agent; that during all that time the said proposed lease, as contained in said act in writing, was the subject of frequent discussions and contestation between plaintiffs, their counsel and defendant's agent, and it was impossible that, under such circumstances, the description of the leased premises should have escaped the notice of plaintiffs and their counsel.

Furthermore, that long before said lease was signed, plaintiffs were aware and informed of the sale made on the 9th of August, 1892, by Pablo Sala to the Pacific Improvement Company, and they intentionally abstained from mentioning the matter to defendant's agent, reserving it as a means for the purpose of thereafter denying their liability under the lease.

Defendant, assuming the character of plaintiff in reconvention, averred that two of the aforesaid rent notes for three hundred and seventy-five dollars each, the one due on the 1st of October, 1895, and one due on the 1st of January, 1896, had not been paid and had been duly protested; and prayed that plaintiff's demand be rejected, and that there be judgment in favor of defendant against plaintiff's firm, and against the individual members thereof *in solido* for the amounts of said two notes with interest and lessor's privilege.

On the 25th day of July, 1895, Dona Maria y Fabrigas brought suit against D. B. Wood & Sons on one of the sixteen notes executed by the latter on the 1st of January, 1894, to-wit: the note for three hundred and seventy-five dollars which fell due on the first of July, 1895.

This suit bore the number 46,632.

On September 2nd, defendants filed an exception to plaintiff's demand. They averred that they had deposited, in court, the sum of one hundred and forty dollars and sixty-three cents, which amount, in legal tender money, had been tendered by them to plaintiff's agent, as would appear by a duly certified copy of the notarial act of tender; that having tendered in full payment and satisfaction any and all amounts due plaintiffs on account of the matter sued on, they pleaded as to the remainder of the said demand *lis pendens,* as shown by the

petition in the suit of B. D. Wood & Sons vs. Dona Maria y Fabrigas. In view of the premises, they .prayed that their exception be maintained; that plaintiffs be condemned to accept the tender as made, and that, thereafter, the suit be dismissed.

Dona Maria y Fabrigas subsequently filed in her own suit against B. D. Wood & Sons a supplemental petition, in which she averred that since the institution of the same three more of the rent notes of three hundred and seventy-five dollars, each furnished by the defendants under the lease alleged in her petition, had fallen due and had not been paid, to-wit: the one payable on the 1st of October, 1895, the other on the 1st of January, 1896, and the one payable on the 1st of April, 1896; that she prayed for judgment on the two notes falling due, respectively, on the 1st day of October, 1895, and the 1st day of January, 1896, in her reconventional demand against the defendants in the suit brought by them against petitioner; that she was equally entitled to judgment on the note falling due on the 1st of April, 1896. She prayed for citation upon defendants, and that she have judgment against them for the amount of said note, with interest.

Counsel of parties agreed that the case of Dona Maria y Fabrigas vs. B. D. Wood & Sons, No. 46,632, and that of B. D. Wood & Sons vs. Dona Maria y Fabrigas, No. 46,331, be consolidated, and tried as one suit, and that the petition of B. D. Wood & Sons, No. 46,331, will stand as answer to the original and supplemental petition in suit No. 46,632.

On the 7th of May, 1897, the District Court rendered two judgments, one in the suit of Dona Maria y Fabrigas vs. B. D. Wood & Sons, No. 46,632, and another in the suit of B. D. Wood & Sons vs. Dona Maria Sala y Fabrigas, No. 46,631.

In the former the court decreed that there be judgment in favor of Dona Maria Sala y Fabrigas and against the defendants for the sum of one hundred and forty dollars and sixty-two cents, to be paid and satisfied from the tender made and amount deposited by B. D. Wood & Sons in the hands of the clerk of the court upon the filing of their answer, said amount of said deposit being subject to the orders ·of the plaintiff, and for the further sum of one hundred and forty dollars and sixty-two cents, with eight *per cent per annum* interest from April 1st, 1896, plus two 50-100 dollars, costs of protest and costs of suit.

In suit No. 46,631, the court decreed that there be judgment rendered

in favor of B. D. Wood & Sons, reducing the rental of the property described in the petition and lease, from one thousand five hundred dollars *per annum* to five hundred and sixty-two dollars and fifty cents *per annum,* from November 24th, 1894, until the 31st December, 1897, and, accordingly, that the (XI) eleven promissory notes of said B. D. Wood & Sons for three hundred and seventy-five dollars each, described in said petition, payable respectively July 1st, 1895, and on the 1st day of each third (3rd) month thereafter, up to and including the first day of January, 1898, be reduced to one hundred and forty dollars and sixty-two and a half cents ($140.62½), each with interest as stated in said notes; that B. D. Wood & Sons have judgment against Dona Maria Sala y Fabrigas for four hundred and sixty-eight dollars and seventy-five cents, proportion off rent notes herein decreed reduced, which were paid for their full amount under protest, January 4th, 1895, and April 4th, 1895, by said B. D. Wood & Sons to said Dona Maria Sala y Fabrigas, with legal interest on the difference between the face of said respective notes and the amount to which they are hereby reduced, say on two hundred and thirty-four dollars and thirty-seven and a half cents from January 4th, 1895, until paid, and on like amount from April 4th, 1895, until paid; that the demand of B. D. Wood & Sons against Dona Maria Sala y Fabrigas for five hundred dollars, value of piling or mooring port, be dismissed as in case of non-suit; that on her demand in reconvention Dona Maria Sala y Fabrigas have judgment against B. D. Wood & Sons for two hundred and eighty-one dollars and twenty-five cents, with eight per cent. *per annum* interest on one hundred and forty dollars and sixty-two and a half cents from October 4th, 1895, and on one hundred and forty dollars and sixty-two and a half cents from 4th January, 1896, until paid.

On May 12th, 1897, Dona Maria Sala y Fabrigas filed a motion for a new trial, the caption to the motion bearing the titles and numbers of both suits and referring to them as "consolidated." The second ground assigned for a new trial was that the court had not given judgment in favor of Dona Maria Sala y Fabrigas for the amount of the rent note sued upon in her supplemental petition, or any part thereof.

In acting upon the motion, the court, under the caption of both suits, said: "The supplemental petition, claiming judgment in suit No. 46,632 for three hundred and seventy-five dollars, on the note falling due April 4th, 1896, was not in the record, and I overlooked the

agreement of counsel in the note of evidence; that the petition of Wood & Sons, in No. 46,631, should stand as an answer to the original and supplemental petition in No. 46,632, and by omission, clerical in nature, a decree in favor of plaintiff, Sala y Fabrigas, in No. 46,632, on said supplemental petition, a copy of which has been substituted for the lost original, was not entered. This omission is brought by the motion for a new trial to my notice and without granting a new trial, otherwise I will order said omission corrected, and award the plaintiff, Dona Sala y Fabrigas, the judgment to which the proof entitles her on said demand. The judgment, No. 46,632, will, therefore, be corrected and amended so as to decree in said plaintiff's favor against B. D. Wood & Sons for one hundred and forty dollars and sixty-two and a half cents, with eight per cent. interest *per annum,* from April 1st, 1896, and two dollars and fifty cents costs of protest and costs of suit No. 46,632 after filing of said supplemental demand, this to be in addition to the decree in said plaintiff's favor already herein entered. In all other respects I think the judgments rendered are correct, and with the correction of what was an error of calculation and an accidental omission, the judgment, as rendered, will stand, and, in all other respects, the motion for a new trial will be dismissed.

"New Orleans, La., May 26, 1897.

(Signed) T. C. W. Ellis,<br>
*Judge."*

A single judgment, embodying the provisions of both judgments under the caption of both cases, seems to have been written out and is copied in the transcript, but it is not signed.

On May 31st, 1897, Dona Maria Sala y Fabrigas, under the caption of both suits with their proper numbers, and referring to them as "consolidated," made a motion for an appeal representing herself as the plaintiff in one of the consolidated cases and the defendant in the other. She averred that she was aggrieved by the judgments in both cases rendered in said consolidated cases signed on the 27th day of May, 1897. On this application, the court granted her an "appeal from said judgments rendered in the two consolidated cases."

On the 3rd of October, 1890, J. Fortuné Zéringue and others leased to B. D. Wood & Sons "the landing and river bank of the Mississippi river known as the Zéringue Landing, under Nine Mile Point, in the Parish of Jefferson, together with all the rights and privileges belonging or pertaining thereto" for the period of five years, beginning on the

15th of October, 1890, and expiring on the 15th day of October, 1895, at the rate of one thousand dollars per year, payable quarterly.

The lessees entered into possession under the lease. At the time of this lease the Citizens' Bank held a mortgage upon the plantation of which "the Zéringue Landing" (the property leased) formed a part of the front.

On the 7th of March, 1892, the Citizens' Bank sold the plantation to Pablo Sala, describing it as "having a front of thirty-one arpents, twelve toises and twelve feet front on the river, less and with the deduction of a narrow strip of land having a front on the Mississippi river of one arpent, and a depth extending back between parallel lines containing within said depth nine 50-100 acres sold by Camille Zéringue to the Barrataria and Lafourche Canal Co. on the 21st of April, 1830, and less and with the deduction also of a portion of said tract occupied by the New Orleans, Mobile & Chattanooga Railroad Co. or their successors, said portion having a front on the Mississippi river of seventeen hundred and twenty feet more or less."

On the 19th of July, 1892, Joseph Lombard, attorney of Pablo Sala, wrote to B. D. Wood & Sons, a letter in which he said that he had been requested by Sala, as the present owner of the Zéringue plantation, in the Parish of Jefferson, to notify them "that the rent of the landing and river bank of the Mississippi river known as the Zéringue Landing, under Nine Mile Point, say four thousand five hundred feet more or less fronting on said river, would be two hundred and fifty dollars, from the 1st of August next (August, 1892) and payable monthly.

On the 9th of August, 1892, Pablo Sala sold to the Pacific Improvement Company, a portion of the plantation which he had purchased, the tract sold having a front of twenty-five hundred feet on the Mississippi river, this front covering the upper twenty-five hundred feet of the Zéringue Landing."

On December 10th, 1892, Sala seems to have sent B. D. Wood & Sons a bill "for five months rent of the landing occupied by them as a coal landing, in the Parish of Jefferson," from the 7th of March, 1892, to the 7th of August, 1892, at eighty-three 33-100 dollars per month, and three months rent of same, from 7th of August, 1892, to 7th November, 1892, at two hundred and fifty dollars per month.

Defendants must have declined to pay this bill for, on the 6th of January, 1893, Sala brought suit against defendants in which he alleged that he had become the owner of the Zéringue plantation from

the Citizen's Bank on the 7th of March, 1892. That at the time of his purchase a portion of the plantation, to-wit: the landing and river bank of said plantation, say four thousand five hundred feet front on said river, under Nine Mile Point, was occupied by defendants as a coal yard, at a monthly rental of eighty-three 33-100 dollars per month, and that on the 19th of July, 1892, he had notified defendants, in writing, that the rent of said portion of said plantation occupied by them, as mentioned, would be two hundred and fifty dollars per month, from and after the 1st of August, 1892. He averred that he was entitled to claim from defendants the rent then due, four hundred and sixteen 65-100 dollars, for five months rent from the 7th of March, 1892, to the 7th of August, 1892, at eigthy-two 33-100 dollars per month, and, furthermore, seven hundred and fifty dollars for three months rent from the 7th of August, 1892, to the 7th of November, 1892, at the rate of two hundred and fifty dollars per month; and he prayed for judgment accordingly.

In January, 1894, (the day of the month not specified) a lease was signed between Pablo Sala and B. D. Wood & Sons for the period of five years, beginning on the first of January, 1893, and expiring on the 31st of December, 1897, in which the property leased was described as "the landing on the river bank of the Mississippi river, known as the Zéringue Landing, under Nine Mile Point, in the Parish of Jefferson, bounded on the upper line by the property of the Pacific Improvement Company, and below by the property of the Texas and Pacific Railroad Company, together with all the rights and privileges belonging or pertaining thereto. The consideration for the lease was the sum of fifteen hundred dollars *per annum,* payable quarterly, at the end of each quarter.

Prior to the signing of this lease, a number of letters had been exchanged between the attorneys of Pablo Sala and those of B. D. Wood & Sons, in reference to a compromise of the suits of Sala vs. B. D. Wood & Sons.

Precisely when the first offer of compromise was made does not directly appear, but in a letter of one of the attorneys of B. D. Wood & Sons to Chrètien & Suthon, attorneys of Sala, dated November 2nd, 1893, he acknowledged receipt of a letter from them of the 31st of October, 1893, relating to the suit of Sala vs. Wood, and in reply stated that, as a compromise, his clients were willing to compromise

upon the same terms which he had proffered to Mr. Chrètien, last Spring.

On the 6th of November, 1893, the same attorney wrote another letter to Chrètien & Suthon, in which he acknowledged receipt of a letter that day from them, in the matter of Sala vs. Wood.

After making this acknowledgment, he said: "In reply, I will state that on May 11th (2nd?), 1893, we proposed, in behalf of our client, as a compromise of the suit to pay your client at the rate of one thousand dollars *per annum* to January 1st, 1893, and take a lease of the property for four years from that date at twelve hundred dollars per year."

We find in the transcript a letter of May 2nd, 1893, written to A. E. Billings, one of the attorneys of B. D. Wood & Sons, by Chrètien & Suthon, in which they say:

*"In re.* Sala vs. Wood *et als.*

"In above case our client begs us to make a counter proposition, which is as follows: He will accept in compromise fifteen hundred dollars per year, payable yearly, to begin on the 7th of August, 1892, the lease to last five years. The sum of four hundred and sixteen 65-100 dollars additional to be paid for rent due from March 7th, 1892, to August, 1892, five months at eighty-three 33-100 dollars per month.

"This being the best that he can do, we hope that the matter will be compromised on that basis, thus ending litigation. You will greatly oblige us by giving an early answer."

On the 11th of May, 1893, Wood's attorneys answered saying (in the suit of P. Sala vs. B. D. Wood & Sons): "Our clients decline to accept the counter proposition made by you, to-wit: to pay one thousand five hundred dollars for rent for the property. The proposition which we made you some time since to pay the rent at the rate of one thousand dollars a year up to the 1st of January, 1893, and thereafter, at the rate of twelve hundred dollars per year, on a five year's lease from date, will be open for acceptance until the 15th of this month, at which time, if not accepted, it will be withdrawn."

At some time between May the 11th, 1893, and November 24th, 1893, the attorneys of the parties seem to have agreed upon the basis of a compromise of Sala vs. Wood, for, on the latter day, we find a letter from Mr. Chrètien to Rice, attorney of Wood & Sons, in which he requests them "to have the act prepared as per our agreement in above

case (*In re*. Sala vs. Wood), and let me know when ready so that I may make my client come to sign the act."

On December 11th, 1893, Rice & Montgomery wrote to Chrètien & Suthon, saying: "In the suit of P. Sala vs. B. D. Wood & Sons, we understand compromise proposed to be as follows: The defendant to pay for use of landing from the 7th of March, 1892, to December 31st, 1892, at the rate of one thousand dollars *per annum,* thereafter, upon a five years' lease, ending December 31st, 1897, at the rate of fifteen hundred dollars *per annum* in quarterly instalments. Accordingly, we have drawn *projet* for a lease which we enclose herewith. Under the compromise a considerable sum would now be due. We understand that defendants have not had a boat at the landing since February. For several months the coal business has been at a total standstill at this port for want of coal. Of course the coal dealers have been and are doing little or no business. Our clients wish for four months' time for which they will furnish you good paper for the amount that would be due if this compromise is effected, to-wit: two thousand three hundred and fifty-seven dollars. If satisfied, please have lease signed in duplicate by your client and we will then have it signed by ours."

In the *projet* for lease forwarded, the property to be leased was described as it had always been "as the river bank known as Zéringue Landing, under Nine Mile Point," and the terms of the lease from the Zéringues to B. D. Wood & Sons were changed only in so far as it was necessary to make the instrument conform as to dates and consideration with the agreement between the parties as understood by Wood & Sons.

This *projet* must have been submitted to Sala who, instead of signing it, caused to be written out himself, through Grima, a notary, an instrument differing only in the addition to the description of the property leased, of the words "bounded by the property of the Pacific Improvement Company, and by the property of the Texas Pacific Railroad property," and the insertion of a clause that "the property was not to be subleased without the permission of the lessor."

On the 3rd of January, 1894, Messrs. Chrètien & Suthon notified Rice & Montgomery that the paper prepared in duplicate had been sent to Wood & Sons to be submitted to them. On the 6th, they replied. that in the matter of Sala vs. Wood *et als.,* they desired to say that their clients' proposition was to extend the lease then in existence, to December 31st, 1897; that they enclosed a copy of prepared lease which had been placed in the hands of Sala's agent; that it contained a clause

not in the original contract; that they had, accordingly, prepared a lease on the terms of proposed compromise; that the same had been signed in duplicate by their clients, and they enclosed the same to be signed by Sala; that they held themselves ready to deliver on the execution of the contract the four months', promissory note for rent due under the compromise. On January 26th, Sala returned to Chrètien & Suthon the writing which had been signed by Wood & Sons for the lease of the Sala property, stating he refused to accept the same because he insisted upon the clause by which the lessees should not sub-lease without the written consent of the lessor, and because he insisted upon a clause by which, in case of non-payment of the rent when due, the lease should be, *ipso facto,* terminated.

This letter was forwarded to Rice & Montgomery, and was replied to by the latter in a communication to Sala's attorneys, in which they declared that, "while they were still willing to carry out the agreement for compromise, they declined to assent to the modification interposed; that as they understood the amendments were insisted upon as an ultimatum, there was no alternative left but to proceed with the suit."

The parties finally signed the instrument which plaintiffs insist evidences in its entirety the agreement between Sala and the defendants, but which the latter deny.

The paper, as signed ,was written out by Mr. Rice, one of the attorneys of B. D. Wood & Sons, from one prepared by Sala and forwarded to him for examination.

On November 26th, 1894, counsel of the Pacific Improvement Company wrote to B. D. Wood & Sons, stating that they had been informed that they claimed to hold a lease of the property on the river front near the Nine Mile Point, formerly belonging to Pablo Sala; that they begged to inform them that the company had purchased the property from Pablo Sala in August, 1892, in ignorance of the existence of any lease, and with a clear certificate from the records of Jefferson Parish, and to know whether they claimed to have a lease of the property and the same was registered. At the time the letter was written, the Pacific Improvement Company had already leased the property to the Beaver Company. This company took possession of the property under their lease.

On January 4th, 1895, B. D. Wood & Sons protested to Sala against this action as a violation of their rights. They said that they would pay their notes, but under protest, and reserve the right to sue for the

recovery and return of the money so paid as well as all other legal and equitable relief. As the different notes signed by them fell due, B. D. Wood & Sons tendered one hundred and forty 63-100 dollars in full payment and satisfaction of each, protesting against further demand of payment on each for the reasons assigned by them in their petition.

The tenders having been refused, the money was deposited in the Citizen's Bank, subject to collection. On the trial of the cause a witness, on behalf of plaintiff, a member of the Pacific Improvement Company, testified that he had met B. D. Wood, one of the defendants in New Orleans, either in July or August, 1892, shortly after the purchase made by the Pacific Improvement Company, from Sala; that he told him he heard his firm claimed a lease of the property for the purpose of mooring his coal boats; that the Pacific Improvement Company, when it purchased the property, caused the records to be examined, and the property was found to be unencumbered; that under the circumstances the lease would not be recognized; that he (witness) then told him that his firm would have to settle that matter with the party from whom he held the lease. Wood, as a witness, positively denied that such a conversation took place, but referred to a later conversation of which he gave the details. He introduced testimony to corroborate his own. The District Court was of the opinion and gave extended reasons therefor that the witness referred to must have been mistaken as to the date of this conversation. We agree with the court that this must have been the case, or that the conversation was of so general and indefinite a character as not to have arrested Wood's attention. We can conceive of no reason which would have induced Wood & Sons to enter into this burdensome lease under such circumstances and to compromise on such a basis a suit which they had been so stubbornly defending. There is nothing anywhere to intimate that the parties at any time had under discussion the subject matter of the thing leased, or any change therein. What was leased was understood between the parties throughout. The district judge, in his judgment of the case, has very thoroughly reviewed the evidence, and stated the grounds upon which he based the conclusions of fact which he had reached. Careful examination of the record and consideration of the reasons assigned have satisfied us of the correctness of those conclusions.

At a distance of nine miles above the city of New Orleans, the right

bank of the Mississippi river takes the shape of a small peninsular, the outer point of which is generally known as Nine Mile Point.

The lower line of this peninsular formed part of the front of a plantation belonging to the Zéringue family. B. D. Wood & Sons and B. D. Wood & Bros., coal merchants, had, for many years, had the occupancy of the portion of that front known as the "Zéringue Landing under Nine Mile Point," as lessees, using the same for the purpose of mooring their coal boats and barges. The value of this landing rests upon the fact that it is protected by the peninsular which, deflecting the current from the shore on that side, affords a harbor of slack water on that side where these boats can be safely landed and kept until the coal is needed for sale. Along the river front, plaintiffs, at considerable cost, erected mooring or hitching posts. Nine of these posts remain. Six of the nine are so distributed that the one lowest down the river is about twenty-five hundred feet below Nine Mile Point. The nine posts are called new posts. Above them were two other new posts which do not remain. Prior to 1888 these lessees had a number of posts still lower down known as old posts, but none of these remain. In August, 1888, a storm wrecked a number of the coal boats moored at the old posts, or below, while the boats moored higher up the stream toward Nine Mile Point escaped. The event showed that the portion of the landing lying next to or under Nine Mile Point was the safest part of the harbor. Since 1888, the sunken wrecks of the boats lost in the storm render navigation dangerous and mooring difficult and impossible at any ordinary stage of the water along the lower part of what previously had been used as a harbor. A storm in 1892 showed the same results, so that it was well established by proof and actual experience that the "Zéringue Landing" had no practical value beyond the protecting influence of Nine Mile Point, owing to the sunken wrecks. The lowest part of said harbor is, perhaps, not over four thousand feet, surely not over forty-five hundred feet below said Nine Mile Point, or, at least, below the upper limits of the Zéringue plantation, as it was in 1890. * * * By an act of 1890, the plaintiffs obtained a lease from the owner, Zéringue, for five years, the property leased being described, as we have seen, as "the landing and river bank known as the Zéringue Landing under Nine Mile Point." After Pablo Sala acquired the plantation from the Citizen's Bank, he was fully advised of the fact that B. D. Wood & Sons were in possession of Zéringue's

Landing under a lease from the Zéringues, for, on the 19th of July, 1892, he notified them that he then owned the property, and that "the rent of the landing and river bank known as the Zéringue Landing, under Nine Mile Point, say forty-five hundred feet more or less fronting on said river," would be two hundred and fifty dollars from the 1st of August next (1892) and payable monthly, and on the 10th of December, 1892, he sent them a bill for five months' rent "of the landing occupied by you as a coal landing, in the Parish of Jefferson, from the 7th of March, 1892, at eighty-three 33-100 dollars per month, and three months' rent of same, from 7th of August, 1892, to 7th November, 1892, at two hundred and fifty dollars per month." His knowledge of the exact situation of B. D. Wood & Sons is made still more apparent from the allegations of his petition claiming rent from them in January, 1893. In this petition he declares that "at the time of his purchase a portion of the plantation, to-wit: the landing and river bank of said plantation, say forty-five hundred feet front under Nine Mile Point, was occupied by defendant as a coal yard at a monthly rental of eighty-three 32-100 dollars per month, and that on the 19th of July, 1892, he had notified defendants, in writing, that the rent of said portion of said plantation occupied by them, as mentioned, would be two hundred and fifty dollars per month from and after the first of August, 1892."

It is perfectly clear from this that the particular portion of the river front for which rent was claimed was that then occupied by B. D. Wood & Sons as a coal yard, and which was being occupied by them for such purpose at a rental of eighty-three 32-100 dollars at the time of Pablo Sala's purchase. The property occupied is referred to "as the landing and river bank of the plantation, say forty-five hundred feet front on said river under Nine Mile Point," and the portion then occupied was, unquestionably, the forty-five hundred feet just below the Nine Mile Point. From the time that this suit was brought up to the time that the parties signed the instrument which forms the matter in dispute in this litigation, the parties and their attorneys were in constant negotiation for a compromise of the existing suit, and this instrument must be read and construed as evidencing the compromise finally reached in respect to the subject matters before the court to that action. The extent of the premises which B. D. Wood & Sons were entitled to occupy under their lease from the Zéringues or the extent of the premises which they were then occupying, was not an issue in that case. That fact was dealt with throughout as a conceded and

accepted fact.  In none of the letters and conversations between the
parties was there any question raised or any suggestion made that B. D.
Wood & Sons were to take, under the new lease, anything less or other
than what they had been possessing and holding under the lease from
the Zéringues, on the contrary, on several occasions it was distinctly
brought to the notice of Sala that the new lease was to be a mere exten-
sion of the old lease, so far as the object leased was concerned.  For
instance, in Mr. Billings' letter of the 6th of November, 1893, to
Chrètien & Suthon, in answer to one from them expressly referring to
the suit of ala vs. B. D. Wood & Sons, he said, "on May 11th, 1893, we
propose, on behalf of our client as a compromise of the suit, to pay
your client at the rate of one thousand dollars *per annum,* and take a
lease of the property for four years from that date at twelve hundred
dollars per year."  What property is here referred to?  Evidently the
same as that for which rent was claimed in the suit which the parties
were then attempting to compromise.  None other had been in the
most remote way alluded to.  Sala's attorneys made a counter proposi-
tion obviously in reference to the same property, stating that he would
accept the compromise—fifteen hundred dollars (the precise amount
finally settled upon  *  *  * ), the lease to be signed to last five years
*  *  *  and expressing the hope that the matter would be compro-
mised on that basis, thus ending litigation.

In Rice & Montgomery's letter to Chrètien & Suthon, of the 11th
December, 1893, they said, "in the suit of P. Sala vs. B. D. Wood &
Sons, we understand compromise proposed to be as follows.  The defend-
ants to pay for the use of the landing from the 7th of March, 1892, to
December 31st, 1892, at the rate of one thousand dollars *per annum,*
thereafter, upon a five years' lease, ending December 31st, 1897, at the
rate of fifteen hundred dollars, payable quarterly, in monthly instal-
ments, accordingly we have drawn up a *projet* of lease which we
enclose.  *  *  *  We understand defendants have not had a boat at
the landing since February.  *  *  *  If satisfied, please have lease
signed in duplicate by your clinent, and we will have it signed by
ours."  The words "to pay for the use of the landing"  *  *  *
"defendants have not had a boat at the landing," found in this letter,
would, of themselves, show what property the attorneys of B. D. Wood
& Sons were referring to, but the *projet* of lease forwarded at the
time, described the property as it had always been as "the river bank
known as Zéringue's Landing."  Sala was placed, by this letter, in a

position which required of him to make known to Wood & Sons all objections which he had to the *projet* forwarded. He did object, but not as to the description of the property about to be leased; he simply made a demand for a specific amendment (from which he receded) that the lessee should not sub-let the property without the written consent of the lessor. He was informed by the terms of the letter and the *projet* that he was dealing with a person who, obviously, had in view a lease of the same property which he had been leasing before, and it was his bounden duty then and there to specially disabuse his mind if he himself proposed to contract on any other basis. It is contended that when the *projet* which had been forwarded was not returned, but a new one was returned, substituted in lieu thereof, in which the words "bounded on the upper line by the property of the Pacific Improvement Company, and below by the property of the Texas and Pacific Railroad Company," notice was brought directly home to them that the description as given by Wood & Sons was not the description under which Sala would consent to contract; that as this instrument so sent by B. D. Wood & Sons was recopied by Mr. Rice, their attorney, it was utterly impossible that this change should have escaped the notice of the parties, and they must have signed it with full knowledge, and, if they did not do so, they were guilty of negligence and *laches,* and have no one to blame but themselves, and they must be bound by the terms of the instrument as it stands; that at the time of the lease to Wood & Sons, the upper twenty-five feet of the Zéringue Landing formed the river front of a tract of land which Sala had already sold to the Pacific Improvement Company; that that act had been recorded, and that Wood & Sons were legally presumed to have had knowledge of it. The district judge, referring to these arguments, said: "Mr. Rice (in his examination of the act forwarded to him) overlooked the fact that boundaries had been added above and below to the description, and, approving the act, it was redrawn in duplicate and signed as it came from Sala's agent. In other words, finding "Zéringue's Landing" under "Nine Mile Point," he overlooked the residue of the description added. This act was dated and signed in January, 1894, and stipulated a lease for five years to begin the 1st of January, 1893, at one thousand five hundred dollars per year. All this time Wood & Sons had been in possession under the act of 1890, and it cannot be doubted that they contracted under the belief that the property described in the act was the same, and that this act was but the renewal of their lease of 1890,

the only changes as they *bona fide* believed being that they were to pay
fifteen hundred dollars per year, instead of one thousand dollars a year,
and that there was to be a prolongation to December 31st, 1897. The
very terms of the lease implied this by any fair interpretation of it
under the circumstances from which it arose notwithstanding the addi-
tion of boundary limits, above or below, in the description of the prop-
erty. At that time Wood & Sons were in ignorance, as were their
attorneys, that Sala, the lessor, had parted with twenty-five hundred
feet of the upper part of said property nearest the Nine Mile Point, by
far the greater part of all the property leased fit for the only purpose
for which they contracted, to-wit: for a coal boat landing. On this
point Sala's agent was *silent.* He saw and read Mr. Rice's *projet*
where boundaries were not stated, and while making special objections
on other matters of detail on this vital matter of the very essence, he
said nothing. The importance of the boundary additions will appear
from the fact that in August, 1892 (prior to the lease in renewal of
January, 1890), Pablo Sala had sold to the Pacific Improvement Com-
pany twenty-five hundred feet of the plantation measuring from about
Nine Mile Point down the river, twenty-five hundred feet, and this
sale was promptly recorded. Of this sale of August, 1892, to the
Pacific Improvement Company, of almost the entire part of said land-
ing available or possible for use, Wood & Sons had no knowledge, in
January, 1894, and they did not discover the fact until November,
1894. This is true beyond all questions, because "

"First—The Pacific Improvement Company, though purchasing in
August, 1892, had not disturbed or notified Wood & Sons, who were in
constant use of the very property which said company had purchased;"

"Second—The fact that the title of said Pacific Improvement Com-
pany was recorded is of no moment, because Wood & Sons, as lessees in
possession, and not as title holders, or claimants of the fee, had no con-
cern with the registry or non-registry of anybody's title to the property.
A lessee deals with the apparent owner in possession, and is not bound
to consult public records as to titles. If disturbed, he calls on his
lessor for protection. Here the Pacific Improvement Company did no
act to signal or signify its possession, and it gave no notice to Wood &
Sons of its title;"

"Third—Wood & Sons *bona fide* believed Sala to be the owner, and
they had good cause for it in the suit No. 37,753, filed January 6th,
1893 (after the sale to the Pacific Improvement Company of August,

1892), wherein Sala sued them (Wood & Sons) for rent not only from March, 1892, to August, 1892, but from August, 1892 (the very month in which he sold to the Pacific Improvement Company), up to November, 1892."

"Fourth—In the lease of January, 1894, Sala's agent gave no notice that twenty-five hundred feet of the Zéringue Landing, under Nine Mile Point, for the great part the only available or possible part of said landing for use as a coal boat harbor, had been alienated. The statement of upper and lower boundaries, after describing the property as the Zéringue's Landing, under or below Nine Mile Point, was no notice."

"Fifth—Wood & Sons, as the evidence overwhelmingly shows, had no knowledge, nor had their attorney, of said sale by Sala in August, 1892, to the Pacific Improvement Company, of the greatest part of said coal boat harbor available for the use and *bona fide* they supposed that they were securing a lease of this alienated part, as they were then, and had been using it for years when they contracted the lease of January, 1894." In respect to the last point, the district judge said that the parties raised a disputed issue of fact, and as to this his findings were as follows: "I find that Wood & Sons had no *bona fide* notice or knowledge of sale of August, 1892. I find this because Mr. C. S. Rice, the plaintiff's then attorney, and every member of the firm of B. D. Wood & Sons, testify positively and affirmatively that they had no knowledge of said act until November, 1894, and that when said lease of January, 1894, was signed they all believed that they were securing a lease of the entire landing, as they had occupied it for years, and then were occupying it, and that they had no knowledge that as said act of lease read it was intended by the lessor that they were leasing a river front beginning twenty-five hundred feet below Nine Mile Point below nearly all of their mooring posts, and were securing for the most part a useless front, where sunken wrecks of boats and liability to storms and exposure to current drifts, etc., rendered a secure harbor for their coal boats an impossibility. This is, in effect, their concurrent, straightforward and reasonable and consistent testimony, and, in fact, they are supported by all the reasonable surroundings and circumstances, for why should they contract to pay one thousand five hundred dollars *per annum* for five years for a thing which could be of no use or value or service for the only purpose which they had in view, their previous lease of the whole landing having been for one thousand dollars."

The district judge, referring to the question of *laches,* said: "It is

argued that the plaintiffs were without legal remedy because of the article of the Code which declares that when the alleged error was apparent or readily discoverable, the party complaining will not be heard. It is on this law argued that the paper containing the *projet* prepared by Sala's agent was placed in the hands of plaintiffs' attorney, and that in it the description as it is in the contract that was signed appeared, and that ordinary diligence would have discovered the change in the title to the extent of the twenty-five hundred feet sold to the Pacific Improvement Company. The answer is that plaintiffs were seeking a compromise of litigation and a renewal or extension of the term of their lease; that they were in possession and had not been disturbed; that they did not know of their lessor's sale to the Pacific Improvement Company, and, as shown, were not charged or chargeable with notice of title by registry, they being mere lessees; that the suit they were seeking to compromise was for rent claimed by Sala to November, 1892, after said sale by Sala to said Pacific Improvement Company, in August, 1892; that all the discussion pending the compromise efforts, and the examination of the *projet* and counter-*projet* of the contract for the extended lease, refer to stipulations, none of which referred to extent of the property or to its reduced extent, and that the description, as written by Sala's executor, was calculated in no wise to apprise plaintiffs that they were getting a landing of much less extent than they had, or that what they were getting was, for the most part, unavailable for their use. They had the 'Zéringue's Landing under 'or below Nine Mile Point,' and had had it for years, and the *projet* of Sala's agent began the description of the property in almost these identical words. When to this beginning of the description he added boundaries, the upper ones of which (viz, by the lands of the Pacific Improvement Company), cut the Zèringue's Landing off by twenty-five hundred feet, in the part which gave to it its chief value as a coal landing, attention should have been drawn by the lessor and the diminution should have been explained, for how could plaintiffs know or suspect that this upper boundary was twenty-five hundred feet below Nine Mile Point? Why might they not suppose on 'the absence of suggestion that the Pacific Company's lands were higher up the river, and far enough above to give them the landing under Nine Mile Point, which they long had had, and which *bona fide* they believed, and their attorney believed they were securing for a renewed term of years? Therefore, because they had been the lessees of the Zéringue Landing, under Nine Mile Point, be-

Fabrigas vs. Wood.

cause this landing was the only one fitted for their business, because the negotiations were intended by plaintiffs to secure a new lease of their landing in its full extent, as they had always had it, because the extent or the diminution of the landing was never the subject of discussion, the property or *res* being as an understood matter, and, because the description as written in the lease specifies in its opening clause the Zéringue's Landing, under or below Nine Mile Point. Plaintiffs' counsel and plaintiffs may well be relieved of the charge of neglect, for on the face of the contract there was nothing to indicate that they were to receive a fraction of the landing instead of the entire landing, or that they were to receive said landing, 5-8ths or more of its only use or available portion lopped off. The chief characteristic and substantial quality of the landing they thought they were leasing was its protection from storm and current and other river dangers, by reason of its lying under Nine Mile Point, and in the paper which they signed was written nothing to indicate that they were getting instead of this (the Zéringue's Landing) only a stretch of river front, only the smaller part of which relatively was susceptible of use and the greater part of which was of no possible service to them and could not be. It is easy to see how the error crept in. Sala's agent had full knowledge of the sale to the Pacific Company, in August, 1892, while the plaintiffs and their attorney had no knowledge of said sale whatever, operating and obscuring from standpoints based on full knowledge on one part and no knowledge on the other part, it is clear that there was never an agreement (the *aggregatio mentium*) as to the *res,* the property—the subject-matter of the attempted contract. There was error of fact on plaintiffs' part, bearing on the very substance of the object of the contract. The only quality of the river front they thought *bona fide* they were leasing, which gave it any value as a coal boat landing, was that it was under the protecting influence of Nine Mile Point, throughout, with twenty-five hundred of the upper part, under said point, taken from them by the Pacific Company, Sala's vendors, what remained to plaintiffs was utterly insufficient and unsuited for its greatest part, absolutely, to the requirements of the business for which they intended to use it, and this was plaintiffs' sole motive for the lease."

"By every rule of the Code this error entitled plaintiffs to relief."

While we have reached the same conclusions that the district judge did, we have done so from a somewhat different standpoint. We are of the opinion that the minds of the parties unquestionably met as to a

lease of the "landing and river bank of the Mississippi river known as the Zéringue's Landing, under Nine Mile Point, in the parish of Jefferson," for the act so declares, and there was in fact a portion of the river front of the Zéringue's plantation which, by occupation and use, had come to be as concrete an object or thing for the purpose of a contract or for identification or pointing out as the Hermitage plantation, the Rienzi plantation, or any other property known in different neighborhoods by special names by parties familiar with the localities. Sala's claim to have these words struck out or modified simply by reason of the fact that boundaries were given, is not well founded, particularly, as under the circumstances of this case, and as between the parties hereto, as all the parties knew or must be held to know that these words described a well defined special part of the Zéringue plantation front. As between these parties the rule *falsa demonstratio non nocet* applies, and if either party has to recede from the exact terms of the act of lease as written, it is Sala and not B. D. Wood & Sons. It was Sala's duty, under the circumstances of this case, to have drawn the attention of Wood & Sons to the addition of boundaries to the description, and he is estopped from denying that he leased to defendants the landing and river bank known as the Zéringue's Landing, under "Nine Mile Point."

Plaintiffs are seeking to avoid loss from being made by an error in the written act to pay for something from which they have received no benefit, while defendant is seeking through the error to recover money for that which she has not given.

The district judge exonerated Sala's agent, who caused the act, as signed, to be prepared, from any intention to lead defendants into error, and ascribes the insertion of the boundaries to a want of appreciation of the influence which might be subsequently claimed to have arisen by reason of the insertion of these words upon the rights of parties, and, also, to the fact that knowing the locality, he did not attach any special significance to any particular part of the Zéringue front. He, none the less, on behalf of his principal, leased the particular thing known as "the Zéringue Landing, under Nine Mile Point."

We are of the opinion that Sala cannot rightfully take advantage of such an error not in the contract, but in the act, intending to evidence it (C. C. 1762). The thing leased could well stand as sufficiently described without the boundaries. The boundaries were not needed for purposes of identification. If they tend to contradict or weaken the

otherwise full description of the object contracted for, they should be rejected.

The lessor as well as the seller (C. C. 2474) is bound to explain himself clearly respecting the extent of his obligations; any obscure or ambiguous clause is construed against him. We must deal with the issues from the standpoint of the lease between the parties having been a lease of the "Zéringue's Landing, under Nine Mile Point," under full warranty. Article 2681 declares that he who possesses a thing belonging to another may let it to a third person, and Article 2682, that he who lets out the property of another warrants the enjoyment of it against the claim of the owner.

We think it a matter of no moment for the purpose of disposing of the particular issues raised between the parties in this case, whether Sala owned the whole or only a part of the property he leased; for whether it belonged to him or not, he undertook to lease the whole of it as between himself and Wood & Sons. We do not think that knowledge by Wood & Sons that a part of the property leased belonged to other parties, even if that fact had been shown, and we do not think it was, would have estopped them from defending themselves against plaintiffs' demand. Hennen's Digest, p. 1344, No. 3.

The utmost extent to which knowledge would have affected Wood & Sons would have been to have cut them off from a claim for damages. They make no such claims here. Their position is simply defensive, and extends no further than protection to the extent that there was a failure of warranty and consideration. (17 Ann. 153.)

Wood & Sons were in possession of that property until they were evicted from a portion of the same by the lessee of the Pacific Improvement Company to the Beaver Company. It is the duty of the lessor (C. C. 296) to cause the lessee to be in peaceable possession of the thing, and he is liable for damages in case of eviction, partial or complete. (C. C. 2696.) If in the lease of a predial estate, the premises have been stated to be of greater extent than they are in reality, the lessee may claim an abatement of the rent (C. C. 2701), in the cases and subject to the provisions prescribed in the title in the Code "Of Sale."

A lease by a riparian proprietor of a portion of the front of his property is a predial lease. The lessees have been evicted from a portion of the property leased exceeding one-twentieth part, and they are enti-

tled to relief whether their rights be tested by Articles 2494, 1896, 1897, 2681, 2682 or 2696 of the Civil Code.

We do not find error in the extent of the reduction made by the district court upon the notes executed by B. D. Wood & Sons, nor of the amount which they are entitled to have repaid to them.

We are of the opinion that the judgment appealed from is correct, and it is hereby affirmed.

BLANCHARD, J., dissents.

MONROE, J., who was appointed to this Bench subsequent to the submission of the case, takes no part in this decision.

## ON REHEARING.

MONROE, J. A careful consideration of this case confirms the conviction that B. D. Wood & Sons were not aware until November 24th, 1894, that their lease from Sala did not include the twenty-five hundred feet of river front that had been sold to the Pacific Improvement Company. It had been included in the original lease from Zéringue as an integral part of the "Zéringue Landing," and was continuously occupied and used by the lessees from 1885 until after the acquisition of the Zéringue plantation by Sala, March 7th, 1892. They were occupying it upon July 19th, 1892, when Sala (through his attorney, Joseph Lombard) notified them that "the rent of the landing and river bank " of the Mississippi river, known as the Zéringue Landing, under Nine " Mile Point, say 4500 feet, more or less, fronting on said river," would be $250 per month from the first of August, 1892, payable monthly. And if Sala believed, as he would seem to have done, that the whole length of the landing was 4500 feet, he must also have believed, upon the 9th of August, 1892, when he sold 2500 feet of it to the Pacific Improvement Company, that he was selling five-ninths of the landing and that his right to collect rent was reduced in the same proportion. Nevertheless, in January, 1893, he sued Wood & Sons for rent from March 7th to August 1st, 1892, at the rate fixed by the lease from Zeringue, and from August 1st to November, 1892, at $250 per month, the rate fixed by himself as the rental value of the whole landing. There was certainly nothing in this circumstance to lead the lessees to suppose that he had parted with the title to a large part of the property. Upon the other hand, there is an abundance of evidence, positive, negative and circumstantial, making it clear beyond peradventure, that the first intimation that Wood & Sons had that the 2500 feet in question were

not included in their lease was in November, 1894, when a coal dealer in Pittsburg informed B. D. Wood that he, the dealer, or his company, had leased a landing at Nine Mile point, and showed him the lease from the Pacific Improvement Company of the river front which that concern had .purchased from Sala. Wood testifies: "That was the first intimation that I ever had that I was dispossessed of that land." He immediately sent two telegrams to his firm in New Orleans, informing them of what he had learned, and instructing them to see his attorney and look into the matter. Two days later (November 26, 1894) the manager of the Pacific Improvement Company wrote to Wood & Sons: "We are informed that you claim to hold a lease of certain property on " the river front near Nine Mile Point, formerly belonging to Pablo " Sala. We beg to inform you that we purchased this property from " Pablo Sala in August, 1892, in ignorance of any lease, and with a " clear certificate from the records of Jefferson parish. Will you kindly " inform us whether you claim to have a lease of the property and " whether the same was recorded. An early reply will oblige." Two days later still (November 28, 1894), the attorneys of the Pacific Improvement Company wrote to the attorneys of Wood & Sons that their client having purchased the property free from any encumbrance could not recognize Wood & Sons' pretensions as lessees, and they wrote another letter to the same effect on December 4th, 1894. In neither of these letters was there any suggestion that Wood & Sons had been apprised of the situation by the agent of the Pacific Company two years before. Beyond this, Charles S. Rice and A. E. Billings, the attorneys who represented Wood & Sons, and B. D. Wood, E. E. Wood, W. H. Wood and Charles W. Wood, the members of the firm, all testify that during the whole course of the negotiations leading to the compromise lease with Sala, in January, 1894, they were never informed, never knew, and never suspected that any change had taken place in the ownership of the property, or that the lease from Sala included any less frontage on the river than had always been included in the Zèringue Landing which was the subject of that lease, as it had for nearly ten years before been the subject of the lease from Zéringue. It also appears from the correspondence between the counsel representing Wood & Sons and Sala, respectively, upon the subject of the proposed compromise, that the property was always referred to as the "Landing," or the "Zèringue Landing," and neither Sala's attorney nor any witness for the appellant has undertaken to say that that correspondence re-

lated to any other property than the "Zéringue Landing" as it had always been known. In other words, it does not appear that the counsel who then represented Sala was any better informed upon the subject than the counsel who represented Wood & Sons, and as he had sued on Sala's behalf to collect rent for the whole landing after Sala had sold twenty-five hundred feet of it, we are satisfied that he was no better informed. The circumstances connected with the preparation of the lease with Sala which was finally agreed on have already been sufficiently considered in the original opinion, and we will not dwell upon them farther than to say that, whilst we acquit the gentleman who represented Sala of having intentionally deceived B. D. Wood & Sons, there is nothing in these circumstances from which the conclusion can be drawn that the latter knew, or ought to have known, that the change in the description of the property, by the addition of upper and lower boundaries, meant a difference of twenty-five hundred feet in the measurement of the "Zéringue Landing, under Nine Mile Point," which was the subject of the lease. We will add in this connection that we have accorded the highest consideration to the testimony of the gentleman who negotiated the sale from Sala to the Pacific Improvement Company, but have nevertheless reached the conclusion that he was mistaken either as to the date or as to the substance of the conversation between Mr. Wood and himself.

The remaining question to be considered relates to the extent of the reduction in price to which B. D. Wood & Sons are entitled by reason of the reduction in the river frontage included in their lease. The judgment appealed from fixed upon 4000 feet as the total frontage of the available landing, and held that the lessees having lost five-eighths of it by reason of the sale to the improvement company were entitled to have their liability reduced in the same proportion; and the judgment as thus rendered was affirmed by the original decree of this court. Our re-examination of the testimony upon this point fails to satisfy us that any error has been committed. It is true that Mr. Pilie, an engineer who was examined on behalf of Mrs. Sala, testified that he measured the front of the Zéringue plantation and found 7200 feet between the upper boundary and the line of a tract which had been sold to the Texas and Pacific Railway Company. It is also true that Mr. Grandjean, an engineer who was examined on behalf of Wood & Sons, measured the same property and found 8400 feet between the same points. And it further appears that the title by which Sala acquired calls for

"thirty-one arpents, twelve toises and twelve feet" (or something less than 6000 feet) between the same two points; so that the question as to the exact measurement of the front of the Zéringue plantation, as purchased by Sala, may be regarded as involved in some doubt. Concerning the proportion of the river front which was available as a coal landing, however, there seems to be less uncertainty. The evidence shows that more than twenty-five years ago Mr. Wilmot leased the whole front of the plantation as a coal landing, and moored his boats about midway between the upper and lower boundary, but that he learned that the location thus selected was unsafe, by losing seven or eight of his boats in one night. It also appears that, in 1888, Wood & Sons lost about thirty boats, at one time, which were moored in front of the lower half of the landing, whilst those in front of the upper half were saved. To these experiences is added the intelligible explanation that the stretch of river bank immediately under the point is valuable as a landing, for the reason that it *is* under the point and is protected from the current, which is deflected by the point to the other side of the river. producing comparatively still water where the boats are moored. It is also said that the position is a more protected one with respect to storms.

Whilst the plantation as acquired by Sala may, therefore, have had a frontage of 8400 feet, it was only the upper half that was available for a coal landing and that was used by B. D. Wood & Sons for that purpose. They had six clumps of mooring piles driven within the twenty-five hundred feet which were sold to the Pacific Improvement Company and three clumps within 1000 feet below, which affords, as it seems to us, the most conclusive evidence as to the actual location of the coal landing, since mooring piles are not likely to have been driven except for the purpose of holding boats; and, upon the other hand, it is hardly to be supposed that a coal merchant will habitually moor his boats at a point where there are no mooring piles to which to fasten them.

The learned judge *a quo* sums up his conclusions upon the points which we have thus considered in the following forcible language, to-wit:

" Therefore, because they had been the lessees of the ' Zéringue Land-
" ing, under Nine Mile Point'; because this landing was the only one
" fitted for their business; because the negotiations for compromise
" were intended by plaintiffs to secure a new lease of *this landing,* in its
" full extent, as they had always had it; because the extent of diminu-

" tion of the landing was never the subject of discussion, the property,
" or *res,* being as an understood matter; and because the description,
" as written in the lease, specified in its opening clause, ' the Zéringue
" Landing, under, or below, Nine Mile Point,' plaintiffs' counsel and
" plaintiffs may well be relieved of the charge of neglect; for, on the
" face of the contract, there was nothing to indicate that they were to
" receive a fraction of the landing instead of the entire landing, or that
" they were to receive said landing with five-eighths, or more, of its
" only useful or available portion lopped off. The chief characteristic
" and substantial quality of the landing they thought they were leasing
" was its protection from storm and current and other river dangers,
" by reason of its lying under Nine Mile Point, and, in the paper which
" they signed was written nothing to indicate that they were getting,
" instead of this (the Zéringue Landing) only a stretch of river front,
" only the smaller part of which, relatively, was susceptible of use, and
" the greater part of which was of no possible service to them, and could
" not be."

For the reasons thus given, we are of opinion that there was no error
in the original decree herein rendered, and it is therefore ordered, ad-
judged and decreed that the same be reinstated and now made the judg-
ment of the court.

BLANCHARD, J., dissents.